UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BASHEEN RUSH (#95-A-4323),                     **REPORT AND**
                                               **RECOMMENDATION**
                       Plaintiff,

v.                                             13-CV-00191(S)(M)

DR. WESLEY CANFIELD, et al.,

                       Defendants.
_____

        Before me is defendants' motion for summary judgment [128].[1]  This motion, being dispositive, has been referred to me by Hon. William M. Skretny for a Report and Recommendation [129].  For the following reasons, I recommend that defendants' motion be granted.

## BACKGROUND

        Plaintiff, an inmate, commenced this action *pro se* in the Southern District of New York pursuant to 42 U.S.C. §1983 against various defendants employed by the New York State Department of Corrections and Community Supervision ("DOCCS").  Complaint [1].  His claims arising from his incarceration at Southport Correctional Facility (Southport") were transferred to this District [104].  He alleges that while he was incarcerated at Southport, defendants were deliberately indifferent to his medical needs by failing to treat his low back pain, taking his back brace and medical shoes, terminating his onion free diet, and failing to prescribe certain medications.  Amended Complaint [52], ¶¶92-103.

_____

[1]      Bracketed references are to the CM/ECF docket entries.

Plaintiff was transferred from Eastern Correctional Facility ("Eastern") to Southport in September 2009. He was first seen by defendant Angela Gorg, a Registered Nurse, on September 9, 2009, and at that time complained of low back pain and requested a back brace, onion free diet and medications. Defendants' Statement of Undisputed Facts [128-2], ¶17. He was placed on a call out to be seen by defendant Wesley Canfield, M.D., the Facility Health Director at Southport (id.). Dr. Canfield examined plaintiff that day and noted plaintiff's history of low back pain, including an electromyography ("EMG") study that was conducted in 2004 and neurosurgery consults from Eastern, which included recommendations for spine surgery in July 2006 and January 2008 (id., ¶19). Although Dr. Canfield discontinued plaintiff's prescription for MS Contin (morphine), he prescribed Ultram and Flexeril (id., ¶20). He also discontinued plaintiff's back brace "because he was not performing work on program related to lifting heavy objects". Canfield Declaration [128-3], ¶7. He further noted that plaintiff had orthopedic boots, but it is unclear from the progress notes from that examination that his orthopedic boots were confiscated. Defendants' Statement of Undisputed Facts [128-2], ¶19; [128-3], p. 14 of 14, Bates No. 000475. Dr. Canfield's treatment plan was to start plaintiff on Neurontin and have EMG and nerve conduction velocity ("NCV") studies performed and to consider a neurosurgery referral (id., ¶20). Dr. Canfield also examined plaintiff's left eye and referred him to an ophthalmologist (id., ¶19).

On September 10, 2009, plaintiff was seen by Nurse Gorg for complaints of low back pain and she explained the change of medication ordered by Dr. Canfield (id., ¶21). Nurse Gorg next saw plaintiff on September 14, 2009 for complaints of a rash and that his pain medication was not working (id., ¶22). He also requested an onion free diet and to be seen by a

pain specialist (id.). Nurse Gorg assessed that plaintiff was able to stand up straight to take his medications and was "exaggerating bending over to retrieve his meds". Gorg Declaration [128-4], ¶9. Nevertheless, she scheduled him to be seen by a doctor/ physician assistant ("PA") (id.). That day Dr. Canfield sent plaintiff a Sick Call Response stating, "I reviewed your onion allergy allegations. The provider at Eastern signed off on an onion free diet on 8/25 even though the RAST test was NEGATIVE in April. There is no evidence of onion allergy." [128-3], p. 13 of 14, Bates No. 000473.[2] On September 20, 2009, defendant Benjamin Oakes, a PA, reviewed plaintiff's records and also recommended that plaintiff continue his current diet because his RAST test was negative for an onion allergy. Oakes Declaration [128-5], ¶8.

On September 16, 2009, plaintiff was seen by Nurse Gorg for complaints of a rash from onions and for pain from his back to his left foot. Defendants' Statement of Undisputed Facts [128-2], ¶24. She informed plaintiff that his RAST test was negative for an onion allergy and referred him to a doctor/PA (id.). Pursuant to the referral, that day Dr. Canfield reviewed Nurse Gorg's progress notes and ordered her to continue to monitor plaintiff's condition (id., ¶25).

Nurse Gorg next saw plaintiff on September 18, 2009 for complaints of a rash and gave him hydrocortisone cream (id., ¶27). On September 21, 2009, plaintiff complained to Nurse Gorg that his medications were not helping his back pain and she inquired with the doctor as to whether there were any alternatives to plaintiff's prescription for Ultram, which was expiring on

---

[2] RAST is a "radioallergosorbent test in-vitro assay to identify food allergies". Oakes Declaration [128-5], ¶8.

September 24, 2009 (id., ¶29). She also noted that he had a rash on his arms, but appeared to be in no acute distress and renewed his prescription for hydrocortisone cream (id.).

On September 23, 2009, Dr. Canfield reviewed plaintiff's medical chart and made notations from that review, including that in 1999, while he was at Greenhaven Correctional Facility, it was noted that there was "'no evidence [or] medical need'" for an onion free diet, and that it was not until ten months after arriving at Eastern that plaintiff first requested an onion free diet. Canfield Declaration [128-3], ¶10; [128-4], p. 19 of 25, Bates No. 000467.[3] The first RAST test in April 2009 was negative and while a subsequent RAST test conducted in August 2009 was positive, the allergist noted that probably it was a "'sensitivity'" to acidic foods (id.). Based on this review, Dr. Canfield continued to conclude that plaintiff did not require an onion free diet (id.).

At that time, Dr. Canfield also reviewed plaintiff's medical records related to his lumbar spine. Canfield Declaration [128-3], ¶10; [131], p. 15 of 41, Bates No. 466. Dr. Canfield's notations from this review of plaintiff's records indicate that plaintiff had a history of a back injuries in 1986 and 1993 (id.). Plaintiff declined discectomy following a neurosurgery consultation in January 2008 (id.). From 2007 to 2008 plaintiff was on Ultram, Percocet, and MS Contin (id.). In 2008 plaintiff received a back brace and was placed on a lifting restriction of 20lbs, but "'refused to limit weight'" (id.). Based on this review, Dr. Canfield's plan was to

---

[3] Plaintiff's response attaches the August 13, 2009 report of Jocelyn Celestin, M.D., who concluded that plaintiff "has dermatographism and consequently may be more susceptible to rashes and itching associated with acidic or spicy food items. This is suggested by the fact that the patient has had rashes also associated with ingestion of tomatoes and oranges. Therefore an onion-free diet is recommended for this patient who has dermatographia and 'sensitivity' to acidic and irritating food items such as onion" [131], p. 29 of 41, Bates No. 767.

"repeat the EMG studies and continue Ultram for 2 weeks and place him on call out to be seen on follow up" (id.). Although not referenced in Dr. Canfield's notes from his review of plaintiff's records, plaintiff's response includes a August 21, 2009 x-ray report of plaintiff's lumbar and thoracic spine, which concluded that there was "degenerative discogenic change L5-S1" and "mild degenerative lower lumbar spondylosis" [131], p. 10 of 41, Bates No. 000325.

On September 24, 27, and 28, 2009, plaintiff's complaints of a rash and regarding his pain medication were referred by Nurse Gorg to PA Oakes, who reviewed the progress notes and continued plaintiff on his current pain medications and ordered Benadryl and hydrocortisone cream for his rash. Defendants' Statement of Undisputed Facts [128-2], ¶¶32-34. Based on complaints to Nurse Gorg on September 30, 2009 that his pain medications were not working, Nurse Gorg referred plaintiff to PA Oakes, who conducted a complete physical examination of plaintiff (id., ¶¶36-37). PA Oakes found that plaintiff had "a full range of motion of his back, there was no pain on palpation of his back. He could easily sit, stand and ambulate. There were no noted neurovascular defects". Oakes Declaration [128-5], ¶10. His assessment was low back pain (id.). Plaintiff indicated that the only pain medications that were effective were Percocet and MS Contin and "indicated that he would not take anything else" (id.). PA Oakes advised plaintiff that those medications "were not indicated" and discontinued his prescription of Flexeril and Ultram (id.). He also noted that a EMG study was ordered (id.).

On October 16, 2009, PA Oakes reviewed plaintiff's progress notes concerning his ongoing complaints of back pain and noted that the EMG study was ordered for November 4, 2009. Oakes Declaration [128-5 ], ¶11 ; [128-5], p. 14 of 17, Bates No. 000462

Nurse Gorg next saw plaintiff on October 20 and 22, 2009 for complaints of low back pain and on the second encounter noted that plaintiff appeared to be in no acute distress. Defendants' Statement of Undisputed Facts [128-2], ¶¶39-40.  PA Oakes reviewed plaintiff's progress notes on October 30, 2009, and reordered Benadryl for his rash.  Oakes Declaration [128], ¶12.  On November 3, 2009, plaintiff was referred by Nurse Gorg to PA Oakes for complaints of low back pain.  Defendants' Statement of Undisputed Facts [128-2], ¶43.  At that time, Nurse Gorg noted that plaintiff appeared to be in no acute distress, ambulated without difficulty and had no difficulty bending over or twisting at the waist (id.).  PA Oakes reviewed his progress notes again and ordered Percogesic for his complaints of low back pain (id., ¶44).

Plaintiff was seen the following day by Nurse Gorg for complaints of low back pain and it was noted that his EMG study was scheduled that day (id., ¶45).  He was next seen for complaints of low back pain on November 9, 2009, and at that time Nurse Gorg noted that he did not appear to be in any acute distress and was ambulating without difficulty (id.).  She also noted that a refill of plaintiff's Percogesic was ordered and that they were awaiting the results of the EMG study, which occurred on November 4, 2009 (id.; [128-4], p. 12 of 25, Bates No. 000456).  Her assessment was "malingering/drug seeking". [128-4], p. 12 of 25, Bates No. 000456.

On November 12, 2009, Nurse Gorg noted that plaintiff was refusing to take Percogesic and that Neurontin and Ultram had not helped him.  Defendants' Statement of Undisputed Facts [128-2], ¶47.[4]  He was again requesting MS Contin or Percocet (id.).  Nurse Gorg noted that he appeared to be in no acute distress and that he walked normally and would not

---

[4]   It is not evident from the record whether Neurontin was ever prescribed for plaintiff while at Southport.

walk bent over until he noticed someone was watching him (id.). Again, her notes stated "malingering/drug seeking". [128-4], p. 12 of 25, Bates No. 000456.

On that same day, PA Oakes met with plaintiff to discuss the EMG results which confirmed L5-S1 radiculopathy in both legs. Defendants' Statement of Undisputed Facts [128-2], ¶48; [131], p. 40 of 41, Bates No. 000789.[5] He performed a physical exam of plaintiff and noted that he had full range of motion in his back, and was able to sit, stand and ambulate easily (id.). PA Oakes noted that a TENS unit[6] previously worked in treating plaintiff's pain and ordered him a unit, as well a Lidoderm Patch for his pain (id.). For his rash, he ordered Kenalog cream (id.).

On November 17, 2009, plaintiff complained of back and stomach pain to Nurse Gorg (id., ¶50). She referred his complaints to a doctor/PA (id.). Pursuant to the referral, that day Dr. Canfield ordered Zantac for plaintiff's complaints of stomach pain (id., ¶51).

On November 20, 2009, plaintiff complained to Nurse Gorg that the Lidoderm was not working (id., ¶52). He also stated that he was in severe pain and requested to be seen by a doctor or surgeon (id.). Pursuant to Nurse Gorg's referral, that day Dr. Canfield sent plaintiff a Sick Call Response stating, "Your EMG confirmed the L5-S1 radiculopathy in both legs. In 2008 the neurosurgeon recommended surgery. I'll request a new appt with a neurosurgeon if you are willing to consider surgery. Let me know." [128-5], Bates No. 000453.

---

[5] The EMG study results indicates that his medications at the time were Ventolin and Flovent. [131], p. 40 of 41.

[6] "A TENS unit is a physical therapy machine used to reduce pain". Gorg Declaration [128-4], ¶23.

On November 23, 2009 PA Oakes reviewed plaintiff's progress notes and ordered a neurosurgeon consultation for plaintiff. Defendants' Statement of Undisputed Facts [128-2], ¶55.[7] On November 30, 2009, he was seen by Nurse Gorg for complaints of a rash (id., ¶56). She noted that he had Benadryl and that the Kenalog cream had helped his rash (id.). She also noted that he had refused Lidoderm for the past eight days (id.). In her notes to the doctor/PA, Nurse Gorg requested a prescription for Kenalog cream and to discontinue plaintiff's prescription for Lidoderm (id.). Pursuant to that request, that day PA Oakes ordered Kenalog cream and discontinued plaintiff's prescription for Lidoderm (id., ¶57).

On December 1, 2009, plaintiff was seen by Nurse Gorg for complaints of a rash and she referred these complaints to the doctor/PA (id., ¶59). The progress notes from that visit indicate that PA Oakes informed plaintiff to use Kenalog cream. [128-4], p. 9 of 25, Bates No. 000451. On January 5, 2010, plaintiff was transferred out of Southport. Defendants' Statement of Undisputed Facts [128-2], ¶61.

## ANALYSIS

**A.     The Summary Judgment Standard**

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party

---

[7]     According to Dr. Canfield, plaintiff never followed up on his offer for a neurosurgery consultation. Canfield Declaration [128-3], ¶15.

seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant.  Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party."  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

However, "[w]hen the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial* . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis in original).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

B.      **Eighth Amendment:  Deliberate Indifference to Plaintiff's Medical Needs**

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his] serious medical needs".  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  The "deliberate indifference" standard has both objective and subjective components. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994), cert. denied, 513 U.S. 1154 (1995).  To satisfy the

objective component, the alleged medical need must be "sufficiently serious." Id.. A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Id. "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

To satisfy the subjective prong, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). "The subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Id. See also Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003), cert. denied, 543 U.S. 1093 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

"[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance, 143 F.3d at 703.

Nevertheless, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan". Id.

Defendants argue that none of plaintiff's conditions "constituted a serious medical need, or that [they] acted with a sufficiently culpable state of mind" Defendants' Memorandum of Law [128-1], p. 5. Even assuming that plaintiff could establish that his back or onion allergy were sufficiently serious conditions satisfying the objective prong, I find that he has failed to establish the subjective prong of the deliberate indifference standard.

Far from suggesting indifference, the record demonstrates that during the approximate four month period plaintiff was incarcerated at Southport,[8] he regularly utilized Southport's medical resources, was examined by the medical staff, who also reviewed his medical history, and consistently attempted to treat his maladies. With respect to his back, defendants had a EMG study conducted, addressed the results of that study with plaintiff, and referred him for a neurosurgery consultation. Defendants also attempted to treat plaintiff's back pain with Percogesic, Ultram, Flexeril, Lidoderm Patches and a TENS unit. Although plaintiff previously received different medications (MS Contin and Percocet) and a back brace while incarcerated at Eastern, the medical staff at Southport concluded that those medications were "not appropriate for chronic low back pain" and ceased his back brace because he was no longer performing work on a program related to lifting heavy objects . See Oakes Declaration [128-5], ¶18; Canfield Declaration [128-3], ¶7.

---

[8] Although plaintiff alleges that he was denied effective treatment from September 8, 2009 to March 12, 2010, there is nothing in the record to indicate that defendants had any responsibility for his medical care after he left Southport on January 5, 2010. Plaintiff's Memorandum of Law [131], p. 6 of 41, ¶7.

"Not every physician will treat every ailment in exactly the same manner. That does not mean that one of the physicians must be acting with deliberate indifference to the patient's needs." Douglas v. Stanwick, 93 F.Supp.2d 320, 325 (W.D.N.Y. 2000). Thus, "a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference." Echevarria v. Canfield, 2014 WL 174109, *4 (W.D.N.Y.), adopted, 2014 WL 993831 (W.D.N.Y. 2014).

"Prison medical staff is given wide discretion in determining how to treat inmates. Williams v. Smith, 2009 WL 2431948, *9 (S.D.N.Y.), recon. denied, 2009 WL 5103230 (S.D.N.Y. 2009). Recognizing that "determinations made by medical providers within their discretion are given a 'presumption of correctness' when it concerns the care and safety of patients", Mendoza v. McGinnis, 2008 WL 4239760, *11 (N.D.N.Y. 2008), I do not find that defendants' conduct rises to the level of deliberate indifference. There is simply nothing in the record to suggest that defendants' conduct in treating plaintiff's back pain was based on anything other than medical judgment. Therefore, these differences in treatment do not render defendants' conduct deliberately indifferent. *See* Williams , 2009 WL 2431948 at *9 ("[A] prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference"); Porter v. Jin, 2010 WL 3767876, *2 (W.D.N.Y.2010) ("The fact that plaintiff may have received surgery after being examined by another physician at a different correctional facility does not transform what otherwise may be a medical malpractice claim to a claim of deliberate indifference in violation of the Eighth Amendment").

Although it is not clear from the record whether and why plaintiff's orthopedic boots were discontinued by Dr. Canfield, "[t]he totality of an inmate's medical care must be considered in order to determine whether a prison official has acted with deliberate indifference to serious medical needs". Wandell v. Koenigsmann, 2000 WL 1036030, *3 (S.D.N.Y. 2000). Thus, when viewed in the context of the entire course of plaintiff's treatment, including the medical care he received to treat his back, this does not rise to the level of culpable recklessness.

Plaintiff also argues that defendants were deliberately indifferent to his back since they knew he wanted "surgery to correct his painful condition and also . . . delay[ed] over 4 months before conducting [the EMG] test." Plaintiff's Memorandum of Law [131], p. 9 of 41. These arguments are belied by the record. The EMG study was conducted approximately two months after he arrived as Southport and once that the results were received, he was promptly provided with the option of receiving a neurosurgery consultation. There is also no indication in the record that plaintiff was requesting surgery. Indeed, he declined a discectomy in January 2008 (Canfield Declaration [128-3], ¶10) and even the February 18, 2010 consultation notes state "I am not sure patient wants surgery". [131], p. 30 of 41, Bates No. 000833. Moreover, defendants did not ignore plaintiff's complaints of pain, which they attempted to treat through a variety of medications. See Douglas, 93 F.Supp.2d at 326 ("Dr. Clark did not direct the nursing staff to withhold *all* pain medication from plaintiff, but just one particular, narcotic medication. That does not show sufficient disregard to plaintiff's medical needs to give rise to a constitutional claim" (emphasis in original)).

With respect to the discontinuance of plaintiff's onion free diet, there is likewise nothing in the record to suggest that this constituted more than a difference in medical judgment.

*See* Williams, 2009 WL 2431948 at *9. To the extent plaintiff was experiencing a rash from a food allergy, defendants attempted to treat it with a variety of medications, including Benadryl, Kenalog cream, and hydrocortisone cream. Even if it was erroneous for Dr. Canfield to discontinue his onion free diet, when viewed in the context of the entire course of plaintiff's treatment, including the various medications he received to treat his rash, this would at most constitute negligence or malpractice. *See* Calloway v. Denane, 2009 WL 3064781, *4 (N.D.N.Y.2009) ("Allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness").

While plaintiff preferred the course of treatment he received at Eastern, the record establishes that he received adequate medical treatment during his incarceration at Southport. Therefore, plaintiff has not raised a triable issue as to whether an Eighth Amendment violation occurred. *See* Chance, 143 F.3d at 703.[9]

**CONCLUSION**

For these reasons, I recommend that the defendants' motion for summary judgment [128] be granted. Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the clerk of this court by January 23, 2015 (applying the time frames set forth in Fed. R. Civ. P. ("Rules'") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Skretny. A party who "fails

---

[9] Given this conclusion, I need not reach defendants' qualified immunity arguments. *See* Defendants' Memorandum of Law [128-1], Point II.

to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated:   January 6, 2015

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge